IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32145-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GUSTAVO DUARTE MARES, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Under RCW 9A.44.060(1)(a), a person is guilty of rape in the third degree when (under circumstances not constituting rape in the first or second degree) the person engages in sexual intercourse with a victim who did not consent to sexual intercourse, and "such lack of consent was clearly expressed by the victim's words or conduct." Gustavo Duarte Mares, whose victim awoke to find him raping her, appeals his conviction of third degree rape on the ground that none of his victim's objections to his sexual advances was contemporaneous. Alternatively, he argues that RCW 9A.44.060(1)(a) is unconstitutionally vague as to *when* the victim's lack of consent must be clearly expressed. His third assignment of error contends that after a State witness coordinator exhibited support for the victim in the presence of the jury and he moved for a mistrial, the trial court was required, but failed, to investigate the risk of juror prejudice.

In the published portion of this opinion we hold that RCW 9A.44.060 is not unconstitutionally vague as applied to the facts of this case and that substantial evidence supports Mr. Mares's conviction. In the unpublished portion, we hold that the trial court's consideration of the risk of juror prejudice from the witness coordinator's act was sufficient and we find, alternatively, that any error was invited by Mr. Mares's lawyer's statement that he did not want anything further said about the incident. We affirm.

FACTS AND PROCEDURAL BACKGROUND

In January 2013, C.D. moved to Omak, where she lived in her aunt and uncle's home. The defendant, Gustavo Duarte Mares, was already living there; he, too, referred to the patriarch of the home as his uncle. C.D. testified that she and Mr. Mares are cousins, although the precise nature of their relationship is unclear.[1]

Although C.D. and Mr. Mares were both working long hours they would occasionally socialize with their mutual family, and on a few occasions did things with one another. C.D. did not consider any of the time she spent with Mr. Mares as a "date." Report of Proceedings (RP) at 57. Mr. Mares knew that C.D. had a boyfriend who lived on the east coast.

---

[1] C.D. testified that Mr. Mares is the son of her father's cousin, while Mr. Mares told police C.D. is his cousin's niece, which would likely make them first cousins once removed. In any event, C.D. refers to Mr. Mares as her cousin.

2

C.D. testified that in the couple of months that she lived in her aunt and uncle's home before being raped by Mr. Mares, there were several occasions when he made romantic advances that she consistently rebuffed. The first was when he put his arm around her shoulder after he had been drinking one night; she nudged his hand away. On another, which occurred about a month before the rape, Mr. Mares was driving with her to Walmart and kept trying to put his arm around her shoulder or his hand on her thigh. C.D. "kept telling him to stop." RP at 60. When he asked, "Why?" she replied, "[B]ecause we [are] cousins." *Id.* She told him that if he did not stop, she was going to take him back to the house.

About two weeks later, C.D. awoke in her bed to find Mr. Mares hovering over her bed, his face right next to hers. C.D.'s bedroom was upstairs and Mr. Mares was supposed to sleep in the basement. When C.D. asked him what he was doing, Mr. Mares replied that he missed her and wanted to sleep with her in her room. C.D. told him that he needed to get out, but Mr. Mares would not leave and kept trying to come onto her bed. C.D. threatened to tell her aunt and uncle if he did not leave, and he eventually left.

Later that month, C.D. invited Mr. Mares to go with her to a casino, where she wanted to pick up an employment application. They both had drinks while there. Because C.D. felt too intoxicated to drive, Mr. Mares drove them home. C.D. fell asleep in the car, but remembers Mr. Mares waking her up when they got back to the house and walking up to her bedroom, where she went to sleep. The next morning, C.D. discovered

3

"hickies" on her neck and had no recollection of how they got there. When she confronted Mr. Mares, he eventually admitted that he had given her the hickies, but told her not to worry about what happened and to just forget about it. C.D. yelled at Mr. Mares, telling him "what he did was wrong and that it wasn't okay." RP at 71-72.

On a Friday night, March 15, 2013, C.D. and Mr. Mares were watching television together. C.D. was tired, having worked twelve hours that day. At her request, Mr. Mares went out to buy some alcohol and returned with bottles of a wine-like beverage. C.D. drank most of two bottles by herself and then went up to her room to go to bed, leaving Mr. Mares behind in the living room.

C.D. next remembers waking up and finding Mr. Mares on top of her, engaged in sexual intercourse. He was naked, and her pants and underwear had been removed. As soon as she realized what was happening, C.D. grabbed a rifle that was next to her on the bed, pulled back the bolt to cock the hammer, and pointed it at Mr. Mares. He told C.D. she didn't know what she was doing and to put the rifle down, but she refused and ordered him to leave her room. After she told him a second time, he grabbed his clothes from the floor and left. C.D. would later admit that she thought about shooting him but knew that rounds tended to go through walls and didn't want to risk hurting her aunt and uncle.

C.D. reported what had happened to the Okanogan Sheriff's Department the following Monday morning. When Mr. Mares later agreed to speak with sheriff's

4

deputies, he initially denied ever having sexual intercourse with C.D. He changed his story when deputies told him that they had C.D.'s clothing and were sending it to the crime lab for testing. Mr. Mares then told the deputies that he and C.D. had consensual sex on the night she claimed to have been raped and that they had engaged in consensual sex twice before. When asked why he initially denied having ever had sex with C.D., Mr. Mares responded that he must have forgotten.

Mr. Mares was charged with one count of third degree rape under RCW 9A.44.060(1)(a), which is based on lack of consent by the victim. Consistent with the terms of the statute, the information alleged that C.D. "did not consent to the sexual intercourse and such lack of consent was clearly expressed by [her] words or conduct." *Id.*

C.D. testified at trial to her ongoing objections to Mr. Mares's advances and to the events of the night she was raped. While testifying to what had happened on the night of the rape, she became emotional and was temporarily unable to continue. The trial court asked her if she "need[ed] a couple of minutes," and then announced, "Members of the jury, we're going to take a short recess." RP at 79. The jurors were excused, but before they left the courtroom the State's witness coordinator approached C.D. on the witness stand and hugged her.

Before the jury's return, the defense moved for a mistrial, arguing that the witness coordinator's conduct might have prejudiced the jury. After hearing from both counsel,

5

the trial judge commented that he saw what had happened, "and sort of cringed myself."

RP at 81. But he continued, "I don't think that it was prejudicial to the Defendant, and

certainly not to the extent that it will require a mistrial." RP at 81-82. He instructed the

witness coordinator to refrain from such conduct in the future and told defense counsel he

would consider giving a curative instruction but that doing so might draw more attention

to the issue. Defense counsel responded:

> Your Honor, I will take exception to the Court's ruling on that on the
> mistrial, but that also means that I would prefer to not mention it any
> further.

RP at 82.

Mr. Mares testified on his own behalf, denying that C.D. ever asked him to leave

her alone and claiming that while he and C.D. did not have sex on the night of the alleged

rape, they had engaged in consensual sex on two other occasions. The jury did not

believe him and returned a guilty verdict. Mr. Mares appeals.

## ANALYSIS

Mr. Mares makes three assignments of error. He contends, first, that insufficient

evidence supports the finding of guilt of third degree rape; second, that RCW

9A.44.060(1)(a) is unconstitutionally vague in violation of due process; and third, that the

trial court conducted an inadequate investigation into whether Mr. Mares was prejudiced

by the witness coordinator's show of support for C.D. We address the first and second

assignments of error together and then turn to the third.

6

*I. Meaning of RCW 9A.44.060(1)(a) and sufficiency of the evidence*

Mr. Mares's sufficiency challenge is to the sufficiency of the evidence to support a finding that C.D. clearly expressed her lack of consent. He construes RCW 9A.44.060(1)(a) to require that the expression of lack of consent be contemporaneous. To determine whether the State produced sufficient evidence to prove this element of the offense, the court "must begin by interpreting the underlying criminal statute." *State v. Budik*, 173 Wn.2d 727, 733, 272 P.3d 816 (2012); *State v. Werneth*, 147 Wn. App. 549, 552, 197 P.3d 1195 (2008). It therefore makes sense for us to address the meaning of the statute and the related issue of its constitutionality at the same time we address the sufficiency of the evidence.

Interpretation of a statute is a question of law that we review de novo. *State v. Bright*, 129 Wn.2d 257, 265, 916 P.2d 922 (1996). "In construing a statute, the court's objective is to determine the legislature's intent." *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). "'[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.'" *Id.* at 600 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)). The plain meaning of a statute is discerned "from the ordinary meaning of the language at issue, as well as from the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Jacobs*, 154 Wn.2d at 600. Additionally, courts must "construe statutes consistent with their underlying

7

purposes while avoiding constitutional deficiencies." *State v. Eaton*, 168 Wn.2d 476, 480, 229 P.3d 704 (2010). Nonetheless, courts "cannot add words or clauses to an unambiguous statute when the legislature has chosen not to include that language," and must "assume the legislature 'means exactly what it says.'" *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003) (quoting *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 964, 977 P.2d 554 (1999)).

If a statutory provision is subject to more than one reasonable interpretation, it is ambiguous. *Jacobs*, 154 Wn.2d at 600-01. In such cases, the rule of lenity requires that the court "interpret the statute in favor of the defendant absent legislative intent to the contrary." *Id.* at 601; *State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1993).

Mr. Mares contends that RCW 9A.44.060(1)(a) is unconstitutionally vague because it requires that the victim's lack of consent must be clearly expressed but does not specify *when*. "The purpose of the vagueness doctrine is to ensure that citizens receive fair notice as to what conduct is proscribed, and to prevent the law from being arbitrarily enforced." *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 739-40, 818 P.2d 1062 (1991). Our Supreme Court has held that "a 'statute is void for vagueness if either: (1) the statute "does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed"; or (2) the statute "does not provide ascertainable standards of guilt to protect against arbitrary enforcement."'" *State v. Watson*, 160 Wn.2d 1, 6, 154 P.3d 909 (2007) (quoting *State v. Williams*, 144 Wn.2d

8

197, 203, 26 P.3d 890 (2001)). Because RCW 9A.44.060(1)(a) does not involve the First Amendment, Mr. Mares's vagueness challenge is not evaluated by examining "hypothetical situations at the periphery of the [statute's] scope," but by inspecting his actual conduct and the particular facts of the case. *City of Spokane v. Douglass*, 115 Wn.2d 171, 182-83, 795 P.2d 693 (1990); *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890, 894 (1992).

The vagueness doctrine "is limited in two significant ways." *City of Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366 (1988). First, "[a] statute is presumed to be constitutional, and the person challenging a statute on vagueness grounds has the heavy burden of proving vagueness beyond a reasonable doubt." *Coria*, 120 Wn.2d at 163. Second, because "[s]ome measure of vagueness is inherent in the use of language", *Haley*, 117 Wn.2d at 740, courts do not require "absolute agreement" or "impossible standards of specificity." *Watson*, 160 Wn.2d at 7 (quoting *Coria*, 120 Wn.2d at 163).

Thus, "[a] statute is not void for vagueness merely because some terms are not defined." *State v. Harrington*, 181 Wn. App. 805, 824, 333 P.3d 410 (2014). Likewise, a statute is not unconstitutionally vague "'merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.'" *Haley*, 117 Wn.2d at 740 (quoting *Eze*, 111 Wn.2d at 27). "[I]f men of ordinary intelligence can understand a penal statute, notwithstanding some possible areas

of disagreement, it is not wanting in certainty." *State v. Maciolek*, 101 Wn.2d 259, 265, 676 P.2d 996 (1984).

The legislature chose in RCW 9A.44.060(1)(a) to address consent in two ways. For a person to be guilty of rape in the third degree under the provision requires both that

- the victim did not consent to the sexual intercourse with the perpetrator, as "consent" is defined in RCW 9A.44.010(7), and

- such lack of consent was clearly expressed by the victim's words or conduct.

"Consent" is defined by RCW 9A.44.010(7) to mean

that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact.

Reading RCW 9A.44.060(1)(a) as a whole, it is clear that the legislature did not intend to criminalize sexual intercourse involving a perpetrator who reasonably but mistakenly believed that the victim was a willing participant. Where lack of consent is clearly expressed by a victim's words or conduct, any asserted "misunderstanding" by a perpetrator is unreasonable and justifies punishment. *State v. Higgins*, 168 Wn. App. 845, 854, 278 P.3d 693 (2012) ("Our focus, and certainly the jury's focus, is more properly on the victim's words and actions rather than [the perpetrator's] subjective assessment of what is being communicated.").

Mr. Mares argues that because the definition of "consent" incorporated by the statute contains a temporal qualifier—namely, that the words or conduct expressing

agreement to sexual intercourse be made "at the time of the act of sexual intercourse"—then we should ascribe the same temporal qualifier to the statute's requirement that lack of consent be clearly expressed. But if the words or conduct of the victim that we look to in applying the statute are exactly the same for both "not consent[ing]" and expressing "lack of consent," there would be no reason for including both requirements. The two requirements are included because they are two different things. As applied to this case, the jury was required to find (1) that C.D. did not consent, and (2) (in order to protect a perpetrator against the possibility of a reasonable misunderstanding) that her lack of consent was clearly expressed. *State v. Guzman*, 119 Wn. App. 176, 185, 79 P.3d 990 (2003) (State must show both that victim did not freely agree and that lack of consent was clearly expressed).

Textually, RCW 9A.44.060 ties only "consent," not "lack of consent" to the temporally-qualified definition in RCW 9A.44.010(7). As written, the statute plainly does not say *when* the lack of consent must be clearly expressed. Mr. Mares does not explain how we justify imposing a requirement of contemporaneity that the legislature chose not to impose. And when we consider that the underlying purpose of the statutory requirement that lack of consent be clearly expressed is to avoid criminalizing a reasonable misunderstanding, it is clear that the substance of the expression can be more important than its timing. Some expressions of lack of consent, if not recanted, are timeless: "Don't ever touch me again;" "If you lay a hand on me, I'm calling the cops;"

11

"I wouldn't have sex with you if you were the last person on Earth." And a statement three weeks ago that "We are cousins; what you are doing is wrong; it is not okay" says more about a person's attitude than does a statement a few moments ago that "I don't know; I'm tired."

We therefore reject Mr. Mares's construction of RCW 9A.44.060(1)(a) as including an implicit requirement that a victim's clear expression of lack of consent must take place at the time of the sexual intercourse.

Turning to Mr. Mares's constitutional challenge for vagueness, Mr. Mares merely argues, conclusorily, that the statute

> is vague because it does not indicate when the lack of consent must be clearly expressed. It does not indicate whether it can be weeks before, at the time of the act, or even after the act.

Br. of Appellant at 13. In fact, the statute cannot be read to indicate that the lack of consent could be expressed after the act, because the criminal act is defined in the present tense ("engages in sexual intercourse") while notice of the objection is couched in the past tense (and lack of consent "was clearly expressed"). Such a reading would also be inconsistent with the purpose of the statute and lead to absurd results.

Mr. Mares offers no authority or argument why reading "lack of consent . . . clearly expressed" to include both past and present "clear expression" makes the statute vague. To merit consideration, parties are required by the rules of appeal to provide argument in support of an issue together with citations to legal authority. RAP

12

10.3(a)(6). By analogy, we point out that RCW 9A.08.010(1)(b), the provision of the criminal code that defines "knowledge" as a level of culpability does not include any timeframe within which a person must acquire knowledge of a pertinent fact or information suggesting that fact in order to be culpable. Mr. Mares's vagueness challenge does not merit further consideration.

As to sufficiency, sufficient evidence supports a conviction if, when viewed in the light most favorable to the State, it allows any rational trier of fact to find guilt beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). On appeal, we draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). We "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Mr. Mares argues that while the testimony showed C.D. rebuffed his advances in the past, her lack of consent to sexual intercourse on the night of March 15 was not expressed by words or conduct until the act was already in progress, at which point Mr.

13

Mares stopped.[2]

The pattern to-convict instruction given to the jury did not require a

contemporaneous objection. It provided in relevant part:

> To convict the defendant of the crime of rape in the third degree,
> each of the following four elements of the crime must be proved beyond a
> reasonable doubt:
>
> (1) That on or between March 15-March 16, 2013, the defendant
> engaged in sexual intercourse with [C.D.];
>
> (2) That [C.D.] was not married to the defendant;
>
> (3)(a) That [C.D.] did not consent to sexual intercourse with the
> defendant and such lack of consent was clearly expressed by words or
> conduct; and
>
> (4) That any of these acts occurred in the State of Washington.

CP 12 (Instruction 9); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY

INSTRUCTIONS: CRIMINAL, 42.02, at 766 (3d ed. 2008).

---

[2] Arguing that actions such as his need not evade punishment, Mr. Mares suggests that a more appropriate charge might have been rape in the second degree, since second degree rape can be committed by having sexual intercourse with a victim who is "incapable of consent by reason of being physically helpless or mentally incapacitated." Br. of Appellant at 10, citing RCW 9A.44.050(1)(b). He points to *State v. Al-Hamdani*, 109 Wn. App. 599, 608-9, 36 P.3d 1103 (2001), in which the court held that a victim's helplessness or incapacitation can be established by debilitating intoxication. In that case, the victim was "stumbling, vomiting and passing in and out of consciousness" and had a blood alcohol content of between .1375 and .21. *Id.* at 609.

Here, the beverage consumed by C.D. had an alcohol content lower than most wines (6 percent alcohol by volume); there was no evidence she had difficulty finding her way to bed; she testified that she had worked a long day and sleeps heavily following long work days; and upon awakening to the rape, she was able to seize and cock a rifle and order Mr. Mares to leave. RP at 26, 77-78, 86-87. On these facts, a charge of second degree rape might not have been a viable alternative.

The State's evidence was that C.D. had responded to Mr. Mares's advances during their entire acquaintance consistently: deflecting embraces by pushing away his hands, telling him that what he was doing was wrong, threatening to take him home and to tell her aunt and uncle about his conduct, telling him to leave her room, and yelling at him. This was more than enough evidence from which the jury could find that her lack of consent to sexual intercourse was clearly expressed by words and conduct.

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

## II. Inadequate investigation of right to mistrial

Mr. Mares's remaining assignment of error is that after the State witness coordinator hugged C.D. in the presence of the jury, the trial court was required to inquire into the potential for juror prejudice, and its inquiry needed to include an "investigat[ion] and develop[ment of] the relevant facts as to any prejudice," it could not "merely summarily conclude no prejudice occurred as the trial court did." Br. of Appellant at 17.

Mr. Mares relies on cases holding that "'[w]hen a nonfrivolous suggestion is made that a jury may be biased or tainted by some incident, the [court] must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial.'" *United States v. Gaston-Brito*, 64 F.3d 11, 13 (1st Cir. 1995) (quoting

15

*United States v. Ortiz-Arrigoitia*, 996 F.2d 436, 442 (1st Cir. 1993)). The only

Washington case that he cites, *State v. Murphy*, 44 Wn. App. 290, 296, 721 P.2d 30

(1986), dealt with the context in which the issue usually arises, which is juror misconduct

in communicating about the case in contravention of the court's instructions. In *Gaston-*

*Brito*, the court reasoned that even where jurors are not accused of misconduct, an issue

of juror bias may be analyzed "under the broad rubric of juror misconduct" because of

the risk that jurors have been prejudiced by facts not in evidence. 64 F.3d at 12.

Analyzing the issue under that broad rubric, a trial judge has broad discretion to

conduct an investigation of jury problems and may investigate accusations of juror

misconduct in the manner most appropriate for a particular case. *State v. Elmore*, 155

Wn.2d 758, 773-75, 123 P.3d 72 (2005); *State v. Earl*, 142 Wn. App. 768, 775, 177 P.3d

132 (2008). The court need not follow any specific format. *State v. Jorden*, 103 Wn.

App. 221, 229, 11 P.3d 866 (2000).

Here, we see no reason for an inquiry beyond that conducted by the trial court.

The judge did not need to conduct a hearing to find out what had happened; he had seen it

himself. He entertained argument on Mr. Mares's motion for a mistrial. During the

argument, the prosecutor pointed out that there was no indication the jurors even knew

who the witness coordinator was and the court agreed, stating that as far as the jury knew,

the coordinator, "could be a relative, she could be a friend, it doesn't really matter, it was

simply a show of support and—by someone, an unknown individual." RP 80-81.

16

The trial court also observed that our Supreme Court had (then) recently held that a trial court enjoys discretion to allow a witness to have a comfort dog at his side during testimony over the objection of a criminal defendant that it would bolster the victim's credibility by presupposing his victimhood. *See State v. Dye*, 178 Wn.2d 541, 555, 309 P.3d 1192 (2013). Although that case arose in a different context, we agree with the trial court that the ongoing presence of a comfort dog for a witness presents a greater potential for juror empathy than the hug that occurred here. In *Dye*, the Supreme Court deferred to the trial court's discretion and concluded that by giving a limiting instruction, the trial court "largely mitigated" any "minor" prejudice arising from the presence of the comfort dog. *Id.* at 557. The trial court offered to instruct here, but Mr. Mares's lawyer declined.

Moreover, Mr. Mares's lawyer declined in terms that, if we were we to find error (and we don't), amounted to invited error. For presumably strategic reasons that the court anticipated, he told the court "I would prefer to not mention it any further," effectively asking the court not to engage in any inquiry of the jurors of the sort Mr. Mares now suggests was required. RP at 82. The invited error doctrine prohibits a party from setting up an error at trial and then complaining of it on appeal. *Hymas v. UAP Distrib., Inc.*, 167 Wn. App. 136, 148, 272 P.3d 889 (2012). It applies when a party "'takes affirmative and voluntary action that induces the trial court to take an action that party later challenges on appeal.'" *Id.* (quoting *Lavigne v. Chase, Haskell, Hayes and Kalmon, PS*, 112 Wn. App. 677, 681, 50 P.3d 306 (2002)).

17

Because the trial court's limited inquiry was reasonable under the circumstances as well as invited, we find no abuse of discretion.

Affirmed.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Korsmo, J.