# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

KATHERINE FRAY obo E.F.,

Respondent,

v.

Z.C.,

Appellant.

DIVISION ONE

No. 81741-8-I

UNPUBLISHED OPINION

DWYER, J. — Z.C. appeals from a sexual assault protection order entered against him. Z.C. contends that the trial court erred by making a factual finding that he sexually assaulted E.F. Because substantial evidence supports the trial court's finding, we affirm.

I

Fifteen-year old E.F. and sixteen-year-old Z.C. dated from November 2019 through January 2020. During this period, two sexual encounters occurred. According to E.F., both were sexual assaults. According to Z.C., both were consensual.

On December 10, 2019, Z.C. and E.F. were at E.F.'s home. According to Z.C., E.F. led him upstairs to her bedroom where they undressed themselves and engaged in sexual intercourse. Z.C. heard the garage door open, indicating that E.F.'s mother had arrived home. The teens stopped sexual contact, went downstairs, and spent the rest of the afternoon in E.F.'s living room. E.F. testified that on December 10 she did not want to have intercourse with Z.C. But

she concedes that she did not say anything to "indicate to him that this was not something [she] wanted." Later that evening, E.F. and Z.C. had the following exchange via text message:

> E.F: Wow today was like
> E.F: Wow
> Z.C: Yeah it was
> . . .
> E.F.: I love you
> Z.C.: I love you too babe
> Z.C.: How are you feeling?
> E.F.: I'm feeling pretty HAPPY

E.F. testified that when she texted "Wow," she "meant it in a negative-like way because [she] was not happy with [herself]." In reference to her text message stating that she was "feeling pretty HAPPY," E.F. testified that she was happy that her father had driven her to school that morning.

On January 28, 2020, Z.C. and E.F. were in E.F.'s living room. According to E.F, Z.C. told her that "I just want to stick it in you once" before going upstairs. E.F. testified that she began having a dissociative episode. E.F. followed Z.C. upstairs and into her bedroom in her dissociative state and they each undressed. E.F. testified that the next thing she remembered was looking down at herself and seeing semen seeping out of her vagina, while Z.C. quickly got up from on top of her and left the room. E.F. also stated that she believes that prior to intercourse, Z.C. asked "Are you sure that you want to do this?" But she did not remember if or how she responded. E.F. testified that she felt overpowered and overwhelmed, and was unable to speak because she was in shock and "extremely fearful."

Z.C. testified to a somewhat different course of events. According to Z.C., before they went upstairs, E.F. and Z.C. were kissing and "touching each other sexually." Z.C. asked E.F. if she wanted to have sex, and E.F. replied that she could not do so because her mother was in the next room. E.F. then led Z.C. to an upstairs bathroom, where she performed oral sex on Z.C.[1] Afterward, E.F. and Z.C. went to E.F.'s bedroom, where they undressed and lay down on E.F.'s bed. E.F. guided Z.C.'s penis into her vagina, and they engaged in brief sexual intercourse before Z.C. ejaculated. Later that evening, Z.C. ended his relationship with E.F. by means of the following exchange of text messages:

> Z.C.: hey
> E.F.: hey
> Z.C.: i'm sorry
> Z.C.: idk,
> E.F.: why babe
> Z.C.: i shouldn't of done what i did
> E.F.: are you mad at me tho?
> Z.C.: with someone i don't love
> Z.C.: no
> Z.C.: i'm mad at me
> Z.C.: like i hate myself rn
> E.F.: i don't know what to say
> Z.C.: same
> Z.C.: …
> Z.C.: i shouldn't of done that I'm sorry
> Z.C.: it's nothing you did
> Z.C.: your perfect
> Z.C.: pretty, and smart
> E.F.: yea…
> Z.C.: i don't want to hurt you
> Z.C.: I'm sorry
> E.F.: what are you saying?
> Z.C.: …
> Z.C.: after we like, you know
> Z.C.: it made me feel like sick to the core, like i shouldn't be doing
> that with you

---

[1] E.F. denies that fellatio took place and the alleged act of fellatio was not relied upon by the trial court to support the order entered.

3

> Z.C.: like i wanted it but, idk…i am naïve
> Z.C.: i just don't feel the same with you as I did a few months ago, like after we did it for the first time…idk everything changed

The following day, E.F. told her mother that Z.C. had sexually assaulted her. E.F. and Z.C. exchanged text messages conversationally in early February. At approximately 1:00 a.m. on February 11, after a conversation in which E.F. and Z.C. had each accused the other of "using" one another, they had the following discussion via text message:

> Z.C.: what we did, was it mutual?
> E.F.: no it wasn't mutual…please stop playing victim, you're the one who used me, also I'm not going to talk to you in person because this is finished, and there's no negotiating anything at all. I don't want anything to do with you, and i think that you should leave me alone from here on out for good, and that it's best to part ways and to avoid each other. i don't feel comfortable or have the want to be your friend or even in your life, and you need to just move on and i please leave me alone. i don't think there should be any more "talking" about any of this just over text. if you want to further talking about it i want an adult present in the room. i don't feel comfortable talking to you just alone. because if feel like you used me.
> Z.C.: i don't think you fully understand my side of the situation here…I'm not trying to play a victim here…you hurt me with all the talk behind my back…i didn't want to break up with you before the dance i was just hesitant because of what happened last year. if you want to move on then I'm fine with that, i want to move on as well, i never used you, i understand the timing was terrible and i am sincerely sorry for that.
> E.F.: look, I never talked anything behind your back and I have no idea what you're even talking about, so don't even put this on me. but I don't bother to even know so don't care to explain it to me. I'm glad you agree about moving on. So this is goodbye, don't ever approach me or talk to me again in person or over text please, and keep my name out of your mouth, and I'm not trying to be mean, I'm saying that to get this across to you. You deserve to be sorry for what you did to me. And I don't want you to ever associate with me ever again. So goodbye [Z.C.]
> Z.C.: [E.F.], I'm sorry about that, I was angry and I let my emotions get the best of me. I shouldn't of blamed you and I shouldn't have been angry and toxic toward you. I want you to understand that I never, never ever wanted you to feel like I used you. It never

4

passed my mind that I would use you for that purpose. I can't possibly understand how much you must be hurt right now. I really want to tell you how stupid and how much of a jerk I was toward you. I thought we both wanted it that night and if I hurt you in any way, physically or mentally I take full responsibility. I know you hate me and you are entitled to that. I agree, we should take a long time apart and not intervene with each others life's. I am sorry. ~ [Z.C.]

Z.C. testified that he asked E.F. "was it mutual?" because he had heard a rumor around school that the encounter was not consensual.

On May 15, 2020, E.F.'s mother filed a petition for a sexual assault protection order on her daughter's behalf. The petition alleged that, since being sexually assaulted, E.F. has experienced flashbacks, panic attacks, and suicidal ideation, and that the sexual assault triggered posttraumatic stress disorder from another time in E.F.'s life. E.F.'s therapist, Spring Hecht, testified in a declaration. Hecht began treating E.F. in June 2019, prior to the incidents at issue. On January 29, E.F. contacted Hecht and expressed that she was "feeling 'stressed out' (fear/anxiety/shame) because she had intercourse with a boy from school named, [Z.C.]" and that she had not consented to intercourse. Hecht also testified that E.F. felt embarrassed to tell her parents, worried about the possibility of pregnancy, and that E.F. reported experiencing an anxiety attack at school.

The trial court found that E.F. was not credible with respect to the incident on December 10, 2019, and that she had failed to prove that the sexual encounter on that date was nonconsensual. However, the trial court found that the incident on January 28, 2020 was nonconsensual sexual conduct, and granted a sexual assault protection order.

Z.C. appeals.

II

Z.C. contends that the trial court erred by finding that the sexual encounter on January 28, 2020, was nonconsensual. Because substantial evidence supports the trial court's finding, we disagree.

When a superior court makes findings of fact, those findings are verities on appeal when they are supported by substantial evidence. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992). "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).

"Where there is conflicting evidence, it is not the role of the appellate court to weigh and evaluate the evidence." Burnside v. Simpson Paper Co., 66 Wn. App. 510, 526, 832 P.2d 537 (1992), aff'd, 123 Wn.2d 93, 864 P.2d 937 (1994). Rather, our "role is simply to determine whether substantial evidence supports the findings of fact and, if so, 'whether the findings in turn support the trial court's conclusions of law.'" In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999) (quoting Org. to Preserve Agric. Lands v. Adams County, 128 Wn.2d 869, 882, 913 P.2d 793 (1996)). "Questions of credibility are left to the trier of fact and will not be overturned on appeal." State v. Boot, 89 Wn. App. 780, 791, 950 P.2d 964 (1998). Moreover, in conducting our review, we view the evidence in the light most favorable to the prevailing party. Scott's Excavating Vancouver, LLC v. Winlock Props., LLC, 176 Wn. App. 335, 342, 308 P.3d 791 (2013).

Z.C. asserts that the only evidence presented that E.F. did not consent to the sexual encounter on January 28 was her text message several weeks later saying "no it wasn't mutual."  But even if we accept Z.C.'s argument that E.F.'s text message after the fact is insufficient to prove that E.F. did not consent to the sexual encounter,[2] Z.C. is incorrect about the content of the trial court record.

E.F. testified that she did not consent to sexual intercourse with Z.C.  E.F.'s therapist testified that E.F. reported to her that she had not consented to sexual intercourse with Z.C.  On appeal, Z.C. argues that testimony that he asked E.F. "Are you sure that you want to do this?" prior to intercourse indicates that E.F. did consent.  However, there is nothing in the record indicating that E.F. answered the question.  Without an answer, Z.C.'s inquiry gives rise to reasonable but competing inferences.  A fair-minded person could infer that Z.C. asked this question because it was not his intention to have sexual intercourse with E.F. without her consent.  However, and to the contrary, a fair-minded person could instead infer that Z.C. asked this question because he was unsure about whether E.F. wanted to have sexual intercourse based on her words and

_____

[2] Z.C. avers that the trial court erred when it "erroneously focused on words expressed weeks after the sexual encounter rather than focus on whether at the time of the sexual encounter, E.F. through her words or conduct expressed to Z.C. at any time her lack of consent during the sexual encounter."  Br. of Appellant at 32.  According to Z.C., our decision in State v. Duarte Mares, 190 Wn. App. 343, 361 P.3d 158 (2015), requires evidence that E.F. clearly expressed her nonconsent at the time of the encounter through her words and conduct.  Not so.  Duarte Mares interprets the former RCW 9A.44.060, which proscribed rape in the third degree until July 28, 2019.  See Duarte Mares, 190 Wn. App. at 353.  The current statute proscribing rape in the third degree, which was in effect at the time of the events in this opinion, does not require that the victim clearly express a lack of consent by words or conduct.  RCW 9A.44.060 ("A person is guilty of rape in the third degree when, under circumstances not constituting rape in the first or second degrees, such person engages in sexual intercourse with another person: (a) where the victim did not consent as defined in RCW 9A.44.010(7), to sexual intercourse with the perpetrator.").  Accordingly, even assuming (without announcing) that a "nonconsensual sexual assault," as defined by the Sexual Assault Protection Order Act, chapter 7.90 RCW, is limited to acts that are codified as sex offenses under chapter 9A.44 RCW, Duarte Mares is inapplicable.

conduct up to that point. Combined with E.F.'s testimony that she was so shocked and frightened that she was unable to speak, a fair-minded person could conclude that E.F. did not answer in the affirmative, did not consent to having sexual intercourse with Z.C., and did not dispel Z.C.'s doubts. When inferences from the evidence conflict, we will not reassign the weight given to the evidence by the fact finder. Burnside, 66 Wn. App. at 526.

Moreover, the trial court was under no obligation to find Z.C.'s testimony convincing. The veracity of both Z.C. and E.F.'s testimony is a credibility determination. Here, the trial court determined that E.F. was not credible with regard to the incident on December 10, but was credible as to her description of events on January 28. It was entitled to do so. Accordingly, substantial evidence supports the trial court's finding that the incident on January 28 was nonconsensual.

Affirmed.

Dwyer, J.

WE CONCUR:

Appelwick, J.