## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57496-9-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ARBIN UPRETI, | |
| Appellant. | |

CHE, J. — Arbin Upreti appeals his conviction for third degree rape of LB. At trial, after the first witness testified, the trial court raised concerns about juror 4 being inattentive. After considering the matter further, the trial court observed that juror 4 paid less attention to the minority women in the courtroom and instructed the parties to observe the juror. The State observed additional inattentiveness. And the trial court made oral findings that juror 4 paid less attention to the minorities than Caucasians. The State echoed the court's concern for the minority attorneys, the judicial officer, the victim, and the defendant. The court declined to question the juror individually as individuals are unaware of their implicit biases. Finally, the court added that "at a minimum juror number four is not paying attention to the evidence so not doing her job" and excused the juror over Upreti's objection. 1 Rep. of Proc. (RP) at 125.

Upreti appeals, arguing that (1) the trial court abused its discretion by not conducting further inquiry before excusing juror 4, and (2) there is insufficient evidence to support the third degree rape conviction. Upreti's arguments fail and we affirm.

FACTS

The State charged Upreti with the second degree rape of LB or, in the alternative, third degree rape.

I. TRIAL EVIDENCE

In December 2019, LB saw Upreti at the gym on a military base, and they exchanged cell phone numbers. LB and Upreti ultimately agreed to meet at LB's apartment. After a couple of drinks, the two began making out. Upreti performed oral sex on LB. They ended up in LB's bedroom.

When Upreti attempted sexual intercourse, LB told Upreti "'no'" and to "get protection." 2 RP at 195. LB continued to move her hips side to side to prevent Upreti from vaginally penetrating her as she told him no and to get protection. LB could feel Upreti continuing to try to penetrate her. The two grappled while Upreti tried to subdue and penetrate LB. Throughout the grappling, LB told Upreti to stop and get protection. During this grappling, Upreti asked if he could perform oral sex again, and LB explicitly said no. Upreti ignored LB's unwillingness and performed oral sex and anally penetrated LB with his finger.

Eventually, Upreti was on top of LB and employed a leg lock maneuver. LB tried to push Upreti backwards, moved her hips in an evasive manner, shook her head no, and continued repeating, "'No. You need to go get protection.'" 2 RP at 213.

Upreti performed a different maneuver and ultimately vaginally penetrated LB. After Upretri released LB's arms, she fell backwards. Upreti attempted to penetrate her again; LB resisted and continued to tell him to stop and get protection. Upreti again grappled LB into a

new position and vaginally penetrated her. LB told Upreti no, "no less than ten times." 2 RP at 225.

Subsequently, Upreti went to the bathroom, returned, and appeared to fall asleep. LB also went to the bathroom and then laid back in the bed. LB testified that she was in shock. About 15 minutes later, Upreti attempted to vaginally penetrate LB again. LB moved her hips evasively, used her hand to push Upreti away, and told him, "'No. You need to stop.'" 2 RP at 232. Upreti gave up and fell asleep.

LB texted her friend to call her and pretend that one of LB's soldiers needed to be picked up. Her friend did not call. About ten minutes later, LB pretended someone called her telling her to pick up one of her soldiers. LB and Upreti discussed the call. Upreti attempted to give LB a hug and left. LB proceeded to the hospital on the military base.

A nurse, Khadijah Bakari, conducted a sexual assault examination on LB. LB initially chose to file a restricted report. Restricted reports are not sent to military command. LB told the nurse that she had been sexually assaulted. The nurse found erythema, or redness, on the top of LB's cervix. And that redness is consistent both with consensual and nonconsensual intercourse. The nurse said LB reported pain and some soreness in the area, but no pain elsewhere.

LB reported the sexual assault to law enforcement when she got home. Detective Julie Mullen met with LB several days later. LB recounted the details of the rape to the detective.

Upreti testified that LB asked him if he had protection, which he denied having. Upreti maintained that LB never told him that he needed to get protection. Upreti's defense was that the entire sexual encounter was consensual and LB did not ask him to stop, nor did he employ any

3

force to control LB. Upreti agreed that he attempted to have sex with LB again after they got back in the bed, but he stopped when LB moved his hand away.

The jury convicted Upreti of third degree rape.

## II. JUROR FITNESS

After nurse Bakari—the first witness—testified, the trial court recounted a sidebar conversation regarding juror 4 possibly sleeping during the proceeding. The court stated juror 4 closed her eyes during the court's opening instruction, but she did not appear to be sleeping. The court further noted that juror 4 appeared to listen to the evidence at times, but she "turn[ed] her chair completely away from the witness." 1 RP at 63. But the court could not see juror 4 for much of the opening arguments. Due to the court's concerns about juror 4's body language, the court asked the three attorneys to particularly observe juror 4 going forward and noted that it would continue observing juror 4 as well.

Defense counsel Purtzer generally thought juror 4 was paying attention as she was taking notes. Counsel Shen for the State observed that juror 4 closed her eyes during "a lot of my opening statement" and some of defense counsel's opening statement. 1 RP at 64. Counsel Zhou, also for the State, observed that juror 4 closed her eyes and remained still during the court's opening instructions. Counsel Zhou also observed that juror 4 adjusted herself when counsel Shen gave her opening statement, closed her eyes again, moved her head, and appeared to be "nodding off." 1 RP at 65. Then, juror 4 maintained those mannerisms through defense counsel's opening, opened her eyes once about halfway through, and closed them again.

After considering the matter overnight, the court was concerned that juror 4's "body language was much more attentive to Mr. Purtzer as opposed to myself, Ms. Shen or the witness

4

[Bakari], and we are all minority women." 1 RP at 69. During a recess, counsel Zhou observed that juror 4 appeared to rest her head on her hand with her eyes closed at points during the morning proceedings. Counsel Zhou thought juror 4 was napping, but also noted that the juror was attentive at times to the witness—Detective Mullen. Defense counsel requested that the court bring in juror 4 to ask her about the nodding off.

The court responded:

I think we may have a more insidious problem. I have been observing juror number four carefully. She is directing her attention at the lectern consistently. She did that throughout the testimony of Ms. Bakari. She did that throughout the time that Ms. Shen was questioning both Ms. Bakari and Detective Mullen. She is, however, shifting her focus to Mr. Purtzer when he is speaking and she is shifting her focus to Detective Mullen when she is speaking. So my concern is increasing that—both for Mr. Upreti and for the minorities here, is I'm not certain that this is something she is aware of, and I'm not certain that it is simply her posture. I don't have a concern that she's sleeping, but her body language when a minority person is testifying or directing the questions or even when the court is instructing is very different. In contrast, the entire panel appears to be making eye contact with the different speakers or not making eye contact with anyone. At times the panel turns its direction and attention to me, and number four has not ever done that, has not made eye contact with me, and generally when I am speaking closes her eyes. So I am concerned about a more insidious issue which may actually impact Mr. Upreti as well.

1 RP at 120-21. The State echoed the court's concern for minority attorneys, the judicial officer, Upreti, and LB—as a minority woman. The State also observed that juror 4's eyes were open the entire time defense counsel engaged in cross-examination. Defense counsel admitted he was "not as attuned to those problems" and deferred to the court when asked about his opinion on juror 4. 1 RP at 122.

The court said it would dismiss juror 4 citing concerns about the differences between the juror's observation style toward Caucasians and other minority groups along with the clear body

language that juror 4 was not focused on the evidence and did not wish to be there. And the court decided not to question juror 4 individually reasoning that individuals are unaware of their implicit biases. Defense counsel objected. The court overruled the objection, adding that "at a minimum juror number four is not paying attention to the evidence so not doing her job." 1 RP at 125.

Upreti appeals.

## ANALYSIS

### I. JUROR FITNESS

A. *Inattention and Bias*

Upreti argues that the trial court abused its discretion by excusing juror 4 without conducting additional investigation and because there was insufficient evidence of bias. We disagree.[1]

"We review a trial court's decision to excuse a juror for abuse of discretion." *State v. Jorden*, 103 Wn. App. 221, 226, 11 P.3d 866 (2000). The judge has the obligation "to excuse

---

[1] Upreti also generally argues that excusing juror 4 violated his due process right to have a jury of his peers and violated his due process rights because the judge made the decision to dismiss the juror too early without sufficient information of bias. Upreti does not develop either of his general contentions and he cites only to the general right to a trial by jury and the right for the jury to be unprejudiced and free from misconduct. RAP 10.3(a)(6) requires "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Brownfield v. City of Yakima*, 178 Wn. App. 850, 876, 316 P.3d 520 (2014). Similarly, "Where a petitioner makes a due process challenge, '[n]aked castings into the constitutional seas are not sufficient to command judicial consideration and discussion.'" *State v. Johnson*, 179 Wn.2d 534, 558, 315 P.3d 1090 (2014) (internal quotation marks omitted) (quoting *State v. Blilie*, 132 Wn.2d 484, 493 n.2, 939 P.2d 691 (1997)). His passing argument based on general due process concerns is insufficient to merit our consideration. Also notable, there is "no right to be tried by a jury that includes a particular juror." *State v. Jorden*, 103 Wn. App. 221, 229, 11 P.3d 866 (2000).

from further jury service any juror, who *in the opinion of the judge*, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110 (emphasis added). Juror bias issues generally relate to an event or the relationship between a juror and a party.[2] *State v. Elmore*, 155 Wn.2d 758, 769, 123 P.3d 72 (2005).

Under CrR 6.5, the trial court may replace a juror found unfit with an alternate juror before the case is submitted to the jury. "CrR 6.5 does not explicitly require a hearing even after the case has been given to the jury." *Jorden*, 103 Wn. App. at 227. Under RCW 2.36.110,

> [t]he test is whether the record establishes that the juror engaged in misconduct. We are unwilling to impose on the trial court a mandatory format for establishing such a record. Instead the trial judge has discretion to hear and resolve the misconduct issue in a way that avoids tainting the juror and, thus, avoids creating prejudice against either party.

*Id*. at 229. When the trial court exercises its fact-finding discretion to this end, we defer to its factual determinations. *Id*.

"[T]he rights implicated by the erroneous dismissal of an impaneled juror lie between the rights implicated by the erroneous dismissal of a potential juror and the erroneous dismissal of a deliberating juror." *Sassen Van Elsloo*, 191 Wn.2d at 814. "[R]acial bias is a common and

---

[2] In his reply brief, Upreti argues that the trial court erred by not applying the test for actual bias for impaneled jurors in *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 815-16, 425 P.3d 807 (2018) (holding that the voir dire actual bias test—"the challenging party must prove (1) that the impaneled juror has formed or expressed a biased opinion and (2) that 'from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially'"— applies to impaneled jurors). Reply Br. of Appellant at 5. As stated in the body, actual bias challenges focus on the relationship between a juror and a party, which is not at issue here. We determine that the actual bias test is the improper test to analyze dismissal of an impaneled juror for implicit racial bias.

pervasive evil that causes systemic harm to the administration of justice." *State v. Berhe*, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019). "[I]mplicit racial bias can affect the fairness of a trial as much as, if not more than, 'blatant' racial bias." *Id*. at 663 (quoting *State v. Monday*, 171 Wn.2d 667, 678, 257 P.3d 551 (2011)). "Implicit racial bias . . . primarily exists at an unconscious level, such that the biased person is unlikely to be aware that it even exists." *State v. Gutierrez*, 22 Wn. App. 2d 815, 820, 513 P.3d 812 (2022).

In the context of a motion for a new trial based in part on implicit racial bias, our Supreme Court examined whether the trial court failed to conduct a sufficient inquiry before denying the motion. *Berhe*, 193 Wn.2d at 656. When implicit racial bias is alleged to be a factor in the jury verdict, our Supreme Court held:

> The ultimate question for the court is whether an objective observer (one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State) could view race as a factor in the verdict. If there is a prima facie showing that the answer is yes, then the court must hold an evidentiary hearing.

*Id*. at 665.

We examined in *Jorden*, whether the trial court abused its discretion by excusing an impaneled juror for inattentiveness without individually questioning the juror. 103 Wn. App. at 224. The State moved to disqualify a juror on the first day of trial because the State maintained that the juror was sleeping. *Id*. The trial court instructed the bailiff to observe the juror. *Id*.

The State moved to disqualify the juror again the next day, "inform[ing] the court that the bailiff had twice given the juror water in an attempt to wake her up." *Id*. Recognizing that "the juror was not 'as attentive as the other jurors,'" the court denied the motion but moved the juror to the front of the jury box. *Id*. at 225. "On the sixth day of trial, the court learned that the

juror's mother was in the hospital, possibly in need of life support." *Id*. But the juror told the court that this did not prevent her from serving. *Id*.

That day, the trial court heard argument and witness testimony from the State about excusing the juror. *Id*. Jorden requested a hearing to question the juror. *Id*. at 226. The court declined the request and gave its observations that the juror "was yawning, dozing, and sitting with her eyes closed." *Id*. We determined that the trial court did not abuse its discretion in excusing the juror—noting that the juror's unfitness was supported by the trial court's own observations, the testimony of the bailiff and the detective, and the fact that the challenged conduct spanned several days. *Id*. at 230.

i. *Additional Investigation Was Not Required under These Circumstances*

Further investigation, like an evidentiary hearing, was not required under the circumstances because the judge gave the parties notice of its concerns with juror 4, an opportunity to observe the juror over two days, and the court and the attorneys corroborated the underlying observations and concerns.

In the context of a pre-deliberation challenge to a juror for inattention, we have previously held that there was no "mandatory format" the trial court had to engage in to establish sufficient evidence of inattention. *Jorden*, 103 Wn. App. at 229. There is no comparable authority for the pre-deliberation challenge to a juror for implicit racial bias. While *Berhe*—pertaining to a challenge to a juror for implicit racial bias raised postverdict—is instructive, it is not controlling as the challenge in that case was raised postverdict. *Berhe* involves facts that could not be observed by the trial court as the challenged conduct occurred during the deliberations, so the court had to consider affidavits as the basis for determining whether a prima

facie showing of racial bias influencing the verdict had been made. 193 Wn.2d at 654. If the prima facie showing was made, the court would then have to hold an evidentiary hearing. *Id*.

Here, the judge and all the interested parties directly observed the conduct by juror 4 over two days. Two attorneys corroborated the court's observations and concerns. The defense attorney, while ultimately objecting to the court's decision not to inquire further of juror 4, for the most part, did not disagree with the observations about juror 4, and defense counsel acknowledged that he was "not as attuned to those problems." 1 RP at 122. Additional concerns or questions, if any, could be made known to the judge and by the three attorney observers during the observation period.[3] Even if the trial court held a hearing to investigate the allegation and required juror 4 to testify, such testimony would likely be unhelpful due to the unconscious nature of implicit racial bias. 193 Wn.2d at 657. So, the juror's own insight into whether their bias affected their behavior is likely not going to be instructive in this situation. Further, these types of questions would potentially bias the juror against one side or the other.

We hold that further investigation, like an evidentiary hearing, was not required under the circumstances because the judge gave the parties notice of its concerns with juror 4, an opportunity to observe the juror over two days, and the court and the attorneys corroborated the observations and concerns—as explored more below.

---

[3] "Upon admission to practice, an attorney takes an oath to abide by the laws of the State of Washington and in their professional conduct employ those means consistent with truth and honor." *In re Disciplinary Proc. Against Cramer*, 168 Wn.2d 220, 232, 225 P.3d 881 (2010).

ii. *There Was Sufficient Evidence of Inattentiveness and Implicit Bias*

The next question before us is whether the record establishes that juror 4 was unfit under RCW 2.36.110. There are two bases upon which the trial court appeared to rely on to find the juror unfit—implicit racial bias and inattention.

We first address implicit racial bias. While implicit racial bias is not an explicit category under RCW 2.36.110, the judge has the obligation "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror . . . by reason of conduct or practices incompatible with proper and efficient jury service." Implicit racial bias is incompatible with proper and efficient jury service.

The trial court found—after the first day of trial—that juror 4's "body language was much more attentive to Mr. Purtzer as opposed to myself, Ms. Shen or the witness, and we are all minority women." 1 RP at 69. The following day, the court again found that juror 4 was paying less attention to the racial minorities—nurse Bakari, counsel Shen, and the judge. The trial court contrasted juror 4's habit of shifting her focus away from minority speakers and her inattentive body language towards minority speakers with the habits of other jurors. Counsel Shen and Zhou provided corroborating observations regarding juror 4's body language.

We defer to the trial court's factual determinations, and here, those factual determinations support the conclusion that juror 4 was unfit to serve on Upreti's jury by reason of implicit racial bias.

As to inattention, after the first day, the trial court observed juror 4 closed her eyes during the court's opening instruction, but she did not appear to be sleeping. The trial court further

noted that juror 4 appeared to listen to the evidence at times, but she "turn[ed] her chair completely away from the witness." 1 RP at 63.

While defense counsel thought juror 4 was paying attention as she was taking notes, the State observed that juror 4 closed her eyes during "a lot of my opening statement," some of defense counsel's opening statement, generally remained still, and appeared to be "nodding off." 1 RP at 64-65. The next day, the State observed that juror 4 appeared to rest her head on her hand with her eyes closed at points during the morning proceedings. The State thought juror 4 was napping, but also noted that the juror was attentive at times to Detective Mullen.

While the trial court was not concerned that juror 4 was sleeping, the trial court observed that juror 4 shifted her focus away from certain witnesses, failed to make eye contact, and closed her eyes when the trial court judge was speaking. The trial court concluded "at a minimum juror number four is not paying attention to the evidence." 1 RP at 125.

Under the circumstances, the record also establishes that juror 4 was unfit by reason of inattention under RCW 2.36.110. In sum, when making determinations regarding juror fitness, it is the judge who has the obligation "to excuse from further jury service any juror, *who in the opinion of the judge*, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110 (emphasis added). The judge is in the best position to observe the jurors, and they have wide discretion under RCW 2.36.110. Here, the record supports that juror 4 was unfit to serve on this trial and the court did not abuse its discretion by excusing the juror without an evidentiary hearing or further investigation given the circumstances.

12

II. SUFFICIENCY OF THE EVIDENCE

Upreti argues that there is insufficient evidence to support the third degree rape conviction because it was "based on nothing more than Ms. [LB]'s . . . statements." Br. of Appellant at 24. We disagree.

We review whether there is sufficient evidence to support a conviction de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). If the evidence viewed in the light most favorable to the State allows any rational trier of fact to find the defendant guilty beyond a reasonable doubt, sufficient evidence supports that conviction. *State v. Mares*, 190 Wn. App. 343, 355-56, 361 P.3d 158 (2015). "On appeal, we draw all reasonable inferences from the evidence in favor of the State and interpret them most strongly against the defendant." *Id*. at 356. We defer to the jury regarding issues of conflicting testimony. *Id*.

Third degree rape occurs where a "person engages in sexual intercourse with another person: (a) Where the victim did not consent as defined in *RCW 9A.44.010(7), to sexual intercourse with the perpetrator." RCW 9A.44.060(1)(a). And "'Consent' means that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact." Former RCW 9A.44.010(7) (2007). And "sexual intercourse" means,

> (a) has its ordinary meaning and occurs upon any penetration, however slight, and
> (b) Also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes, and
> (c) Also means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

Former RCW 9A.44.010(1) (2007). "'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." Former RCW 9A.44.010(2) (2007).

Viewing the evidence in the light most favorable to the State, there is clearly sufficient evidence to support Upreti's third degree rape conviction. LB repeatedly told Upreti to stop and get protection before intercourse. LB repeatedly moved her hips to avoid vaginal penetration and used her hands to prevent Upreti from vaginally penetrating her. These words and the aforementioned conduct demonstrate that LB no longer consented to have sexual intercourse. LB consistently testified to this end. And Upreti vaginally penetrated her anyway. LB relayed these events to a nurse and a detective.

Additionally, Upreti later performed oral sex and anally penetrated LB with his finger without consent, and each of those acts constitute sexual intercourse under former RCW 9A.44.010(2). Thus, those two acts independently meet the basis for the third degree rape conviction. There was more than enough evidence from which the jury could find LB did not consent to any further sexual intercourse as clearly expressed by her words and conduct.

Upreti argues there is insufficient evidence because the conviction is based on LB's unsupported assertions about the rape and because LB's testimony is diametrically opposed to Upreti's. But LB's testimony does not have to be corroborated. *See* RCW 9A.44.020(1). LB and Upreti are the only direct witnesses. While we recognize their testimony is diametrically opposed, we defer to the jury who found LB more credible. *Mares*, 190 Wn. App. at 356.

14

No. 57496-9-II

Upreti also seems to argue that the jury could not have found that Upreti engaged in unlawful conduct because LB's actions afterward may have been inconsistent with having been raped. But the question before the jury was whether the sex was consensual. The State presented abundant direct testimony from LB that after the first consensual act, the remaining sexual encounter was not consensual. The rationality of LB's actions after the fact does not make the evidence constitutionally insufficient. We hold that sufficient evidence supports the third degree rape conviction.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, J.

Veljacic, A.C.J.

15